**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Felipe Peerally*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIPE PEERALLY, derivatively on behalf of E.L.F. BEAUTY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MANDY FIELDS, TIFFANY DANIELE, MARIA FERRERAS, LORI KEITH, LAUREN COOKS LEVITAN, KENNY MITCHELL, BETH PRITCHARD, GAYLE TAIT, MAUREEN WATSON, RICHARD WOLFORD, and TARANG AMIN, <br><br> Defendants, <br><br> and <br><br> E.L.F. BEAUTY, INC, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Felipe Peerally ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant e.l.f. Beauty, Inc. ("Elf" or the "Company"), against Defendants Mandy Fields ("Fields"), Tiffany Daniele

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

("Daniele"), Maria Ferreras ("Ferreras"), Lori Keith ("Keith"), Lauren Cooks Levitan ("Levitan"), Kenny Mitchell ("Mitchell"), Beth Pritchard ("Pritchard"), Gayle Tait ("Tait"), Maureen Watson ("Watson"), Richard Wolford ("Wolford"), and Tarang Amin ("Amin") (collectively, the "Individual Defendants" and with Elf, "Defendants), to remedy the Individual Defendants' breaches of fiduciary duties and violations of federal law as contained herein.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of publicly available information, filings by Elf with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits including the securities class action *In re e.l.f. Beauty, Inc. Securities Litigation,* No. 5:25-cv-02316 (N.D. Cal.) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Elf against certain current and former officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties and violations of the federal securities laws committed between May 25, 2023 and February 6, 2025, both dates inclusive (the "Relevant Period").

2.    Elf is a cosmetics company that sells skin care and cosmetic products through its subsidiaries e.l.f. Cosmetics, e.l.f. Skin, Well People, Naturium, and Keys Soulcare. Elf functions primarily as a retail distributor and has a large retail presence in the U.S., while also selling its products online directly to consumers.

3.    Throughout the Relevant Period, the Individual Defendants assured (and caused the Company to assure) investors that the sales growth Elf experienced prior to the Relevant Period would continue as a result of strong demand in all the Company's channels. Indeed, Defendants falsely explained away possible signals of slowing demand—such as rising inventory

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

levels—by falsely telling investors that Elf was ordering more inventory to meet the strong demand they were currently seeing.

4. In reality, however, the Individual Defendants knew that Elf's sales growth would not continue, as they had observed plummeting demand trends, including: (i) rising inventory levels; (ii) declining sales from large, important retailers; and (iii) the repeated failures of the Company's key "innovation" products that had been critical to Elf's success up to that point.

5. The truth was partially revealed on August 8, 2024, when the Company disclosed weaker-than-expected guidance. In response, Elf's stock price declined by more than 14% in a single day, as investors became concerned about Elf's sales growth. However, Defendants continued to mislead investors throughout the rest of the 2024 calendar year, reassuring the market that Elf had continued to see strong demand and that the Company's higher inventory was because of the strong demand that Defendants had observed.

6. Then, on February 6, 2025, Defendants were forced to reveal that, contrary to their representations to investors, Elf was not growing. On that day, Elf released quarterly financial results that reduced the Company's outlook by lowering revenue and adjusted EBITDA guidance for the 2025 Fiscal Year. The Individual Defendants stated that guidance was lowered because of slower than expected new product performance, lower demand trends, and challenging category conditions.

7. On this news, Elf's stock price fell $17.36 per share, or 19.90%, from a closing price of $88.49 per share on February 6, 2025, to a closing price of $71.13 per share on February 7, 2025.

8. As a result of the foregoing, on March 6, 2025, the Securities Class Action was filed in this Court against the Company as well as Defendants Amin and Fields.

9. On June 13, 2025, Plaintiff, through Plaintiff's counsel, served a demand on Elf's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Elf to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A. On July 14, 2025, Plaintiff's counsel received a letter on behalf of the Board (the "Initial Letter") indicating that the Board "intends to consider the Demand at its next regularly scheduled Board meeting." The Initial Letter is attached hereto as Exhibit B. On September 29, 2025, Plaintiff received a second letter on behalf of the Board (the "Demand Refusal Letter"), stating that the Board had met regarding the Demand and determined "to defer substantive consideration of the Demand until a later point in time." The Demand Refusal Letter is attached hereto as Exhibit C.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27(a) of the Exchange Act because Elf is headquartered in this District, Defendants have conducted business and received compensation in this District, Defendants' actions have had an effect in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

14.     Plaintiff is, and has been, a continuous shareholder of Elf at all relevant times.

15.     Nominal Defendant Elf is a Delaware corporation with its principal executive offices located at 601 12th Street, Suite 1400, Oakland, California 94607. Elf's common stock trades on the New York Stock Exchange under the ticker symbol "ELF."

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

16. Defendant Fields has served as the Company's Chief Financial Officer ("CFO") since April 2019. According to the proxy statement filed on Schedule 14A with the SEC on July 9, 2025 (the "2025 Proxy Statement"), in fiscal year 2025, Defendant Fields received $5,106,694 in total compensation from the Company.

17. Defendant Daniele has served as a Company director since May 2022. Defendant Daniele serves as a member of the Board's Audit Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Daniele received $192,575 in total compensation from the Company.

18. Defendant Ferreras has served as a Company director since August 2024. Defendant Ferreras serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Ferreras received $167,252 in total compensation from the Company.

19. Defendant Keith has served as a Company director since July 2020. Defendant Keith serves as a member of both the Board's Nominating and Corporate Governance Committee and the Audit Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Keith received $195,494 in total compensation from the Company.

20. Defendant Levitan has served as a Company director since June 2016. Defendant Levitan serves as the Chair of the Board's Audit Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Levitan received $198,118 in total compensation from the Company.

21. Defendant Mitchell has served as a Company director since November 2020. Defendant Mitchell serves as the Chair of the Board's Compensation Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Mitchell received $194,983 in total compensation from the Company.

22. Defendant Pritchard served as a Company director from November 2017 until March 2025. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Pritchard received $211,126 in total compensation from the Company.

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

23. Defendant Tait has served as a Company director since November 2022. Defendant Tait serves as a member of the Board's Compensation Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Tait received $189,870 in total compensation from the Company.

24. Defendant Watson has served as a Company director since August 2015. Defendant Watson serves as the Chair of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Watson received $187,995 in total compensation from the Company.

25. Defendant Wolford served as a Company director from September 2014 until August 2024. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Wolford received $23,736 in total compensation from the Company.

26. Defendant Amin has served as the Company's Chief Executive Officer ("CEO") and as a Company director since January 2014 and as President since March 2019. According to the 2025 Proxy Statement, in fiscal year 2025, Defendant Amin received $8,834,379 in total compensation from the Company.

27. Non-Party Chip Bergh ("Bergh") has served as a Company director since April 2025. Non-Party Bergh is named herein given his status as Company Director at the time the Demand was refused.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28. By reason of their positions as officers, directors, and/or fiduciaries of Elf and because of their ability to control the business and corporate affairs of Elf, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

29. Each director and officer of the Company owes to the Company and its

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

30.　　As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

31.　　The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

32.　　To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)　　ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Elf's own Code of Business Conduct and Ethics;

(b)　　conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)　　remain informed as to how Elf conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Elf and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Elf's publicly disclosed financial information would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     Each of the Individual Defendants owed to Elf and the shareholders the duty of loyalty requiring that each favor Elf's interest and that of its shareholders over their own while

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

35. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Elf.

36. At all times relevant hereto, the Individual Defendants were the agents of each other and of Elf and at all times acted within the course and scope of such agency.

## CODE OF BUSINESS CONDUCT AND ETHICS

37. Elf maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that "[a]ll directors, officers and employees . . . of the Company are expected to be familiar with the Code and to adhere to the principles and procedures set forth below."

38. In a section titled "Disclosures," the Code of Conduct provides the following:

The information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

39. In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct provides the following:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company (together, the "Senior Financial Officers") are also required to promote

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compliance by all employees with the Code and to abide by Company standards, policies and procedures.

Covered Parties must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and U.S. antitrust and export control laws, in addition to applicable state and local laws, including those relating to anti-harassment, anti-discrimination and equal opportunities.

40.     In a section titled "Fair Dealing," the Code of Conduct provides the following:

Each Covered Party should deal ethically and fairly with the Company's customers, service providers, vendors, suppliers, competitors and employees. No Covered Party should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice. Inappropriate use of proprietary information, misusing trade secret information that was obtained without the owner's consent or inducing such disclosures by past or present employees of other companies is also prohibited.

41.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct provides the following:

All Covered Parties should protect the Company's assets and ensure their proper and efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used only for legitimate business purposes and not for any personal benefit or the personal benefit of anyone else.

The obligation of employees to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports.

42.     In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides the following:

As a public company we are subject to various securities laws, regulations, and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition, and results of operations. Inaccurate, incomplete, or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all our financial disclosures are full, fair, accurate, timely, and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws, and regulations for accounting and financial reporting of transactions, estimates, and forecasts.

## SUBSTANTIVE ALLEGATIONS

*Defendants' Materially False and Misleading Statements*

43.    On May 24, 2023, Elf issued a press release announcing its financial results for the fourth quarter and full fiscal year of 2023. In the release, the Company stated, "Net sales increased 78% to $187.4 million, primarily driven by strength across our retailer and e-commerce channels." Defendant Amin added, "We grew net sales by 78% in the fourth quarter, marking our seventeenth consecutive quarter of net sales growth."

44.    During a related earnings call, Defendant Fields stated, "As CEO Amin discussed, this year we plan to invest behind our ERP transition to SAP, working capital to support the strong demand we continue to see, and increasing our distribution capacity." She added: "We ended the fiscal year with significant momentum and believe we have the right strategy in place to support our growth in the year ahead. In Q1, we expect our net sales growth to come in well ahead of our 22% to 24% annual growth, reflecting the ongoing strong consumption trends we are seeing."

45.    On May 25, 2023, Elf filed an annual report on Form 10-K for the fiscal year ended March 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Amin, Fields, Keith, Levitan, Mitchell, Daniele, Tait, Pritchard, Watson, and Wolford. It included Sarbanes-Oxley Act of 2002 ("SOX") certifications from Defendants Amin and Fields attesting that the report fairly presented the Company's financial condition and operating results. The report also stated that Elf's internal control over financial reporting was effective as of March 31, 2023.

46.    These representations were materially misleading. By this time, internal data showed that wholesale shipments were outpacing actual retail sell-through. The Company lacked adequate internal controls to monitor key retail metrics such as inventory velocity and sell-through rates, yet publicly claimed those controls were functioning effectively. Management also

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

portrayed demand trends as strong and sustainable while omitting adverse facts about mounting inventory levels and channel stuffing. As a result, investors were misled into believing that demand was genuine and that Elf's financial oversight and controls were sound—when, in reality, both were deteriorating.

47. On July 12, 2023, Elf filed its 2023 Proxy Statement with the SEC on Schedule 14A, soliciting shareholder votes for the reelection of Defendants Mitchell, Tait, and Watson and the approval of executive compensation. The 2023 Proxy Statement was solicited by Defendants Amin, Daniele, Keith, Levitan, Mitchell, Pritchard, Tait, Watson, and Wolford, and stated the following with respect to "the Role and Responsibilities of our Board":

> Our Board represents our stockholders' interests and is responsible for furthering the long-term success and value of e.l.f. Beauty, consistent with our Board's fiduciary duties to our stockholders. Our Board has responsibility for establishing broad corporate policies, setting strategic direction and overseeing management, which is responsible for the day-to-day operations of e.l.f. Beauty.
>
> In fulfilling this role, each director must exercise his or her good faith business judgment in the best interests of e.l.f. Beauty and our stockholders. We are committed to conducting our business in accordance with ethical business principles. Integrity and ethical behavior are core values of e.l.f. Beauty. Our Board provides the best example of these values and will reinforce their importance at appropriate times.
>
> Our Board oversees the risk management process, while management oversees and manages risk on a daily basis. Our executive team provides regular reports to our Board on areas of material risk to e.l.f. Beauty, including operational, financial, legal, regulatory and strategic risks. In addition, as part of its review of operational risk, our Board reviews cybersecurity risks facing e.l.f. Beauty, including the potential for breaches of our key information technology systems and the potential for breaches of our systems and processes relating to the protection of consumer and employee confidential information.

48. With respect to the Company's "Corporate Governance Materials," the 2023 Proxy Statement provided the following, in relevant part:

> Our Corporate Governance Guidelines are intended to provide a set of flexible guidelines for the effective functioning of our Board, including director qualifications and responsibilities, management succession and Board committees. Our Corporate Governance Guidelines are reviewed regularly and

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

revised as necessary or appropriate in response to changing regulatory requirements, evolving best practices and other considerations. . . .

In addition to our Corporate Governance Guidelines, we have adopted a Code of Business Conduct and Ethics for our directors, officers, and employees, including our principal executive officer, principal financial officer and principal accounting officer. Our Code of Business Conduct and Ethics is designed to help directors and employees resolve ethical and compliance issues encountered in the business environment. We will make any legally required disclosures regarding amendments to, or waivers of, our Code of Business Conduct and Ethics on our investor relations website.

49.     The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

50.     In truth, the Company was experiencing growing inventory imbalances and weakening consumer demand—facts not disclosed to shareholders. Revenue, inventory, and profit figures were materially overstated, and officers and directors failed to adhere to the Company's Code of Conduct without disclosing or obtaining the required waivers. These misrepresentations induced shareholders to approve executive compensation packages and reelect directors under false pretenses, perpetuating the misconduct and compounding the harm to the Company.

51.     On August 1, 2023, Elf issued a press release announcing its financial results for the first quarter of fiscal year 2024. The Company reported that net sales had increased 76% to $216.3 million, "primarily driven by strength in both our retailer and e-commerce channels." Defendant Amin stated:

This marks our eighteenth consecutive quarter of delivering both net sales growth and market share gains... As we look ahead, we believe we are in the early innings

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of unlocking the full potential we see for e.l.f. Beauty and are raising our fiscal 2024 outlook to reflect our continued momentum.

52.    Later that day, during a related earnings call, Defendant Fields disclosed that the Company's inventory balance had risen to $98 million, up from $70 million the prior year. She assured investors that the increase was "in line with our expectations" and necessary to "support the strong consumer demand we're seeing." She emphasized: "Shipments exceeded consumption this quarter as we started to recover on some out of stock items," and reiterated management's plan to "build back our inventory levels through fiscal 2024" in anticipation of continued demand. Defendant Fields also cited ongoing investments in infrastructure, ERP systems, working capital, and distribution capacity, all positioned as necessary to sustain the Company's "significant top line outperformance." She further noted that inventory reserves had come in "lower this quarter," but acknowledged that such adjustments "ebb and flow from quarter to quarter," indicating volatility in inventory valuation and quality.

53.    During the same call, Defendant Amin echoed these assurances, stating: "We're off to an incredibly strong start this fiscal year, delivering first quarter results well ahead of expectations," and emphasized that "e.l.f. grew net sales by 76%," marking its eighteenth consecutive quarter of growth. He described Elf as "one of only five public consumer companies out of 274 total that has grown for eighteen straight quarters."

54.    Elf filed its quarterly report for the first quarter of fiscal year 2024 with the SEC on August 2, 2023 ("Q1 2024 10-Q"). The Q1 2024 10-Q, signed by Defendants Amin and Fields, included SOX certifications attesting that the report fairly presented, in all material respects, the financial condition and operating results of the Company. It also stated that Elf's internal controls were effective as of June 30, 2023, and that management, including Defendants Amin and Fields, had evaluated those controls and found no material weaknesses.

55.    The Q1 2024 10-Q described inventory levels as aligned with demand, reinforcing the narrative that strong sell-through and demand visibility supported ongoing growth. In reality, Elf's internal controls over financial reporting and inventory management were already

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

deteriorating. A growing misalignment between inventory levels and retail sell-through had begun to distort revenue recognition and obscure risks.

56. On November 1, 2023, Elf issued a press release announcing its financial results for the second quarter of fiscal year 2024, reporting: "Net sales increased 76% to $215.5 million, primarily driven by strength in both retailer and e-commerce channels." Defendant Amin was quoted as saying:

> We continue to deliver exceptional, consistent, category-leading sales growth. In Q2, we grew net sales by 76% and category share by 330 basis points, marking our 19th consecutive quarter of growth in each. As we look ahead, the significant whitespace we see across color cosmetics, skin care and international gives us confidence that we are in the early innings of unlocking the full potential we see for e.l.f. Beauty.

57. That same day, the Company held an earnings call to discuss the results. Defendant Amin continued to emphasize the Company's strong performance:

> In the second quarter, we grew net sales by 76%, increased gross margin by 570 basis points and delivered $60 million in adjusted EBITDA, up 122% versus prior year.

> We're one of only five public consumer companies out of 274 that has grown for nineteen straight quarters and averaged at least 20% sales growth per quarter.

> Our supply chain offers the best combination of cost, quality and speed in our industry and has been able to keep pace with the strong consumer demand we're seeing.

58. On the same call, Defendant Fields also underscored management's confidence in the Company's planning and demand visibility: "Our ending inventory balance was $147 million, in line with our expectations and up from $81 million a year ago. … We plan to build back our inventory levels through fiscal 2024 to support the strong consumer demand we're seeing." Defendant Fields explained that part of the increase was due to a shift in accounting treatment: "Approximately $37 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S." She further

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

assured investors that the growth in inventory was controlled and strategic and noted that "lower inventory adjustments" had supported margin performance during the quarter.

59. On November 2, 2023, Elf filed its quarterly report on Form 10-Q for the second quarter of fiscal year 2024 ("Q2 2024 10-Q"). The Q2 2024 10-Q, signed by Defendants Amin and Fields, included SOX certifications attesting that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company." Management described Elf as well-positioned in the competitive beauty market due to its value proposition, innovation, consumer engagement, and operational agility. The Q2 2024 10-Q emphasized strong relationships with major retail partners—including Target, Walmart, and Ulta Beauty—as drivers of continued domestic and international expansion.

60. In discussing the Company's overview, the Q2 2024 10-Q provided:

premium-quality products at accessible prices with broad appeal differentiates it in the beauty industry. The Company believes the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market.

The Company's family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Well People and Keys Soulcare. The Company's brands are available online and across leading beauty, mass-market and specialty retailers. The Company has strong relationships with its retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled the Company to expand distribution both domestically and internationally.

61. In discussing the state of the Company's internal controls over financial reporting, the Q2 2024 10-Q stated the following:

We have assessed the impact on changes to our internal controls over financial reporting and conclude that there have been no changes to our internal *control over financial reporting* that occurred during the quarter ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

62. The statements made in November 2023 by the Company and Defendants Amin and Fields were materially false and misleading. While the Company portrayed itself as executing a well-managed and disciplined growth strategy, Elf was already experiencing a significant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disconnect between wholesale shipments and actual retail sell-through. Inventory levels at key retail partners were rising beyond consumer demand, creating hidden risks to future growth and profitability. Rather than disclose these developments, Elf misrepresented its demand visibility and falsely suggested that rising inventory was the result of deliberate planning. At the same time, management affirmatively stated in the Q2 2024 10-Q that there had been no changes to internal controls over financial reporting, despite known deficiencies that prevented accurate monitoring of retail-level inventory and sell-through velocity.

63.    On February 6, 2024, Elf issued a press release announcing its financial results for the third quarter of fiscal year 2024. The release reported that net sales had increased 85% to $270.9 million, "primarily driven by strength in both retailer and e-commerce channels." Defendant Amin was quoted as stating:

> Our vision is to create a different kind of beauty company and you can see that in the exceptional, consistent, category-leading growth we've delivered. In Q3, we grew net sales by 85% and market share by 305 basis points, marking our 20th consecutive quarter of growth in each. I'm extremely proud of our team and the progress we continue to make across color cosmetics, skin care and internationally.

64.    During the related earnings call, Defendant Amin reiterated these claims:

> In Q3, we grew net sales by 85%, increased gross margin by nearly 350 basis points, and delivered $59 million in adjusted EBITDA, up 61% versus prior year… We've executed against our vision and delivered exceptional, consistent category leading growth. Q3 marked our 20th consecutive quarter of net sales growth, putting e.l.f. Beauty in a rarefied group of consistent, high growth consumer companies.

65.    On the same call, Defendant Amin further stated: "We feel really good about the 53% growth that's implied in Q4, even though we're comping a quarter that's closer to 80%." Defendant Amin also touted the Company's financial outlook, noting:

> We believe we are well-positioned to deliver another industry leading year. Our raised outlook reflects the outperformance in Q3 we saw relative to our expectations as well as an improved outlook for the balance of the year. Our guidance implies approximately 48% to 53% net sales growth in Q4. Turning to

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

gross margin. In fiscal '24, we expect our gross margin to be up approximately 280 basis points year-over-year, as compared to our expectations for up 225 basis points previously. The improved outlook is largely a result of our outperformance in Q3.

66.    Defendant Fields echoed this narrative, highlighting strong digital growth and forecasting continued expansion:

Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with approximately $72 million in cash on hand compared to a cash balance of $87 million a year ago. Our ending inventory balance was $205 million in-line with our expectations and up from $81 million a year ago.

67.    Defendant Fields disclosed that the Company's inventory had risen to $205 million—up from $81 million a year earlier—and attributed the increase to three factors: planned rebuilding of inventory to support anticipated consumer demand; a shift in accounting treatment that recognized inventory from China at the time of shipment rather than receipt; and the addition of Naturium's inventory. She added: "We believe we have the appropriate levels of inventory across the business to service our customers and support the demand we're seeing."

68.    On February 7, 2024, Elf filed its quarterly report for the third quarter of fiscal year 2024 ("Q3 2024 10-Q"). The Q3 2024 10-Q included SOX certifications, signed by Defendants Amin and Fields, attesting that the filing fairly presented the Company's financial condition and results. The Q3 2024 10-Q claimed that Elf's value-driven, clean beauty offerings and execution capabilities positioned it well in the competitive market, citing strong retail partnerships with Target, Walmart, and Ulta as drivers of expanded distribution. The Q3 2024 10-Q also stated there were no material changes to internal controls during the quarter.

69.    In discussing the Company's overview, the Q3 2024 10-Q stated:

The Company believes its ability to deliver cruelty-free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates it in the beauty industry. The Company believes the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company's family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Well People and Keys Soulcare. The Company's brands are available online and across leading beauty, mass-market and specialty retailers. The Company has strong relationships with its retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled the Company to expand distribution both domestically and internationally.

70.    In discussing the status of the Company's internal controls over financial reporting, the Q3 2024 10-Q stated:

We have assessed the impact on changes to our internal controls over financial reporting and concluded that there have been *no changes to our internal control over financial reporting* that occurred during the quarter ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

71.    The foregoing statements made in February 2024 by the Company and Defendants Amin and Fields were materially misleading because they projected a narrative of uninterrupted growth, strong demand, and well-managed operations. In reality, internal risks were intensifying. Inventory levels were escalating significantly faster than actual sell-through at retail, and demand was beginning to soften. Despite these warning signs, management failed to disclose the risks associated with channel saturation, excess inventory, and the limitations of its internal controls. By reinforcing a narrative of sustained expansion and operational control, Defendants Amin and Fields materially misled investors about the Company's financial condition and future prospects.

72.    On May 22, 2024, Elf issued a press release announcing its financial results for the fourth quarter and fiscal year ended March 31, 2024. The Company reported that "net sales increased 71% to $321.1 million, primarily driven by strength across our retailer and e-commerce channels." Defendant Amin stated:

Fiscal 2024 marked our strongest year of net sales growth on record, a continuation of the exceptional, consistent, category-leading growth we've delivered. In [the] fourth quarter, we grew net sales by 71% and expanded our market share by 325 basis points, marking our 21st consecutive quarter of net sales and market share growth. As we look ahead, we believe we are still in the early innings of unlocking

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the full potential we see for e.l.f. Beauty across cosmetics, skin care and international markets.

73.    During the Company's earnings call shortly thereafter, Defendant Amin further emphasized the Company's growth trajectory: "In fiscal 2024, we grew net sales by 77%, increased gross margin by approximately 330 basis points, grew adjusted EBITDA by 101%, and increased market share by 305 basis points, well above our original expectations." He also claimed that: "We are one of only five public consumer companies out of 274 that has grown for 21 straight quarters and averaged at least 20% sales growth per quarter," and credited this performance to the Company's "value proposition, powerhouse innovation, and disruptive marketing engine."

74.    Notably, on the same call, Defendant Amin underscored Elf's bullish outlook on demand trends, stating, "We feel great about our inventory position… and certainly have room to support even further demand and upside potential should that come to fruition." He also remarked that the Company was "seeing a tremendous amount of pent-up demand for the brand" in international markets and that "consumers internationally are waiting for e.l.f. when we enter the market."

75.    Defendant Fields echoed these optimistic themes in her prepared remarks during the same call: "Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans." She reported that the Company ended the quarter with $108 million in cash and an inventory balance of $191 million—up sharply from $81 million a year prior. Fields again attributed the huge increase in inventory to three factors: (1) a deliberate inventory build "to support strong consumer demand"; (2) the addition of Naturium, which added $26 million to inventory; and (3) a shift in how the Company accounts for China-based inventory ownership.

76.    On May 23, 2024, Elf filed its annual report on Form 10-K for the fiscal year ended March 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Amin, Fields, Keith, Levitan, Mitchell, Daniele, Tait, Pritchard, Watson, and Wolford, and included SOX certifications, signed by Defendants Amin and Fields, attesting to the accuracy of the financial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disclosures. The 2024 10-K portrayed Elf's market position as strong and differentiated, citing its accessible, clean beauty products and execution capabilities. It further claimed that internal controls over financial reporting were effective as of March 31, 2024.

77. In discussing the Company's internal controls over financial reporting, the 2024 10-K stated:

> Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based upon the framework in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management concluded that our internal control over financial reporting was effective as of March 31, 2024.

78. The foregoing statements made in May 2024 by the Company and Defendants Amin and Fields were materially misleading because they presented a narrative of accelerating growth, strong consumer demand, and disciplined inventory management, while omitting adverse internal data. In truth, the Company was already experiencing softening demand, retail channel saturation, and a growing disconnect between wholesale shipments and actual retail sell-through. Rather than acknowledge these issues, Defendants attributed the inventory buildup to benign factors such as strategic planning and logistics realignment—thereby concealing the extent to which reported revenue overstated true consumer pull-through. At the same time, the Company continued to affirm the strength of its internal controls and financial condition, materially misrepresenting the true state of its operations.

79. The foregoing statements were materially false and misleading when made as they failed to disclose material adverse facts regarding the Company's business, operations, and prospects. Specifically, they failed to disclose that: (1) the Company was facing greater challenges in maintaining adequate inventory levels due to a decrease in sales; (2) Elf attributed these inventory levels to challenges in its sourcing practices; (3) Elf reported inflated revenue, profits, and inventory for several quarters; and (4) as a result, the Company's business and/or financial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

80.     On July 12, 2024, Elf filed its 2024 Proxy Statement with the SEC on Schedule 14A. The 2024 Proxy Statement sought shareholder approval on director reelections, executive compensation, and officer exculpation. Defendants Amin, Daniele, Keith, Levitan, Mitchell, Pritchard, Tait, Watson, and Wolford solicited the 2024 Proxy Statement, which provided the following with respect to the "Role and Responsibilities of the Board":

> Our Board represents our stockholders' interests and is responsible for furthering the long-term success and value of e.l.f. Beauty, consistent with our Board's fiduciary duties to our stockholders. Our Board has responsibility for establishing broad corporate policies, setting strategic direction and overseeing management, which is responsible for the day-to-day operations of e.l.f. Beauty.

> In fulfilling this role, each director must exercise his or her good faith business judgment in the best interests of e.l.f. Beauty and our stockholders. We are committed to conducting our business in accordance with ethical business principles. Integrity and ethical behavior are core values of e.l.f. Beauty. Our Board provides the best example of these values and will reinforce their importance at appropriate times.

> Our Board oversees the risk management process, while management oversees and manages risk on a daily basis. Our executive team provides regular reports to our Board on areas of material risk to e.l.f. Beauty, including operational, financial, legal, regulatory and strategic risks. In addition, as part of its review of operational risk, our Board reviews cybersecurity risks facing e.l.f. Beauty, including the potential for breaches of our key information technology systems and the potential for breaches of our systems and processes relating to the protection of consumer and employee confidential information.

81.     With respect to the Company's "Corporate Governance Materials," the 2024 Proxy Statement stated the following:

> We believe that good corporate governance is important to ensure that, as a public company, we will be managed for the long-term benefit of our stockholders. We have reviewed the corporate governance policies and practices of other public companies, as well as those suggested by various authorities in corporate governance, and have also considered SEC and NYSE rules. Based on this review, we have established and adopted charters for each of our Board committees, and

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

have adopted Corporate Governance Guidelines, a Code of Business Conduct and Ethics and our Insider Trading Program.

Our Corporate Governance Guidelines are intended to provide a set of flexible guidelines for the effective functioning of our Board, including director qualifications and responsibilities, management succession and Board committees. Our Corporate Governance Guidelines are reviewed regularly and revised as necessary or appropriate in response to changing regulatory requirements, evolving best practices and other considerations.

In addition to our Corporate Governance Guidelines, we have adopted a Code of Business Conduct and Ethics for our directors, officers, and employees, including our principal executive officer, principal financial officer and principal accounting officer. Our Code of Business Conduct and Ethics is designed to help directors and employees resolve ethical and compliance issues encountered in the business environment. We will make any legally required disclosures regarding amendments to, or waivers of, our Code of Business Conduct and Ethics on our investor relations website.

82.     The 2024 Proxy Statement falsely claimed that the Board was managing risk effectively, that directors complied with the Code of Conduct, and that financial disclosures were accurate. In reality, the Company faced unresolved inventory issues and softening demand, which were concealed from shareholders. The Board failed to address these risks or prevent misleading disclosures, leading shareholders to approve proposals under false pretenses.

***The Truth Begins to Emerge as False and Misleading Statements Continue***

83.     The truth began to emerge on August 8, 2024, when Elf issued a press release announcing financial results for the first quarter of fiscal year 2025. Although the Company reported ostensibly strong headline figures—including net sales of $324.5 million, a 50% year-over-year increase—it also issued adjusted EBITDA guidance that came in approximately $30 million below analyst expectations.

84.     Despite this disappointing outlook, senior management continued to issue statements that concealed mounting risks related to inventory buildup, internal control deficiencies, and deteriorating demand visibility. In the press release, Defendant Amin stated:

We are off to a strong start this fiscal year, delivering 50% net sales growth and 260 basis points of market share gains… This marked our 22nd consecutive quarter of both net sales growth and market share gains—putting e.l.f. Beauty in a

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

rarified group of high growth consumer companies. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond.

85. During the related earnings call held later that day, Defendant Amin reiterated these points while ignoring key signs of operational weakness:

In Q1 we grew net sales 50%, increased gross margin by approximately 80 basis points, and delivered $77 million in adjusted EBITDA… We are one of only five public consumer companies out of 274 that has grown for 22 straight quarters and averaged at least 20% sales growth per quarter.

86. During the Q&A session, in response to a question about whether the Company was seeing any signs of a consumer slowdown, Defendant Amin stated:

On your second question on consumer, any consumer slowdown or sentiment overall, I would say we are seeing some commentary of consumers being more choosy, but they're choosing e.l.f. I would say that we're particularly well positioned. … so we remain quite bullish in our ability to continue to drive market share both in color as well as skin care and our continued expansion internationally.

87. During the same call, Defendant Fields echoed this optimism and attempted to reassure investors about Elf's inventory position, stating: "Our ending inventory balance was $200 million, in line with expectations and up from $98 million a year ago." She once again attributed the massive inventory increase to three factors: rebuilding inventory to support "strong consumer demand," the inclusion of $26 million from newly acquired Naturium, and a $23 million shift in inventory accounting due to earlier transfer of ownership from China. She concluded: "We feel great about our inventory position… we've proactively taken our inventory levels up to support the demand that we're seeing… We are pleased with what we're seeing out of our retailers digitally, internationally... and continue to think we have momentum there."

88. The following day, Elf filed its quarterly report on Form 10-Q for the first quarter of 2025 ended June 30, 2024 ("Q1 2025 10-Q"). The Q1 2025 10-Q included SOX certifications, signed by Defendants Amin and Fields, attesting that the report fairly presented the Company's financial condition. Consistent with prior filings, it promoted Elf's mission-driven branding and emphasized strong retail relationships with Target, Walmart, and Ulta Beauty.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89.    The Q1 2025 10-Q also affirmed: "We have assessed the impact on changes to our internal controls… and concluded that there have been no changes… that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

90.    However, these statements stood in sharp contrast to material risks that were already unfolding inside the Company. By this time, the Company was already grappling with significant internal risks, including excess inventory, deficient internal controls, and a widening disconnect between wholesale shipments and retail sell-through. None of these adverse developments were disclosed. Instead, management continued to present a façade of operational momentum and financial strength.

91.    Analysts expressed concern over the unexpected cut to guidance. UBS Research described the reduction as a "meaningful move" that implied channel underperformance and called the deceleration in top-line growth "perplexing," noting that "many of the key building blocks" of Elf's growth narrative appeared unchanged.

92.    On this news, Elf's stock fell $27.12 per share, or 14.4%, closing at $160.83 on August 9, 2024—its steepest single-day decline in over a year.

93.    On November 6, 2024, Elf issued a press release announcing financial results for the second quarter of the 2025 fiscal year. The release reported that "Net sales increased 40% to $301.1 million, primarily driven by strength in both our retailer and e-commerce channels, in the U.S. and internationally." Defendant Amin added, "This was our 23rd consecutive quarter of both net sales growth and market share gains. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond."

94.    During the related earnings call, Defendant Amin stated: "In the second quarter, we grew net sales by 40%, delivered $69 million in adjusted EBITDA, and became one of only six public consumer companies out of 546 that has grown for twenty-three straight quarters and averaged at least 20% sales growth per quarter."

95. Defendant Fields echoed this positive narrative: "Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans." Defendant Fields then reported that Elf ended the quarter with $97 million in cash and $239 million in inventory, up from $147 million the prior year, and attributed the increase to timing of inventory ownership, the Naturium acquisition, and projected demand. In response to questions about the Company's growing inventory levels, Defendant Fields stated: "We feel great about our inventory position and feel that we have the inventory that we need to continue to support the demand that we're seeing." Significantly, Defendant Fields denied any risk of obsolescence, asserting that the inventory buildup supported the Company's global expansion and would normalize by year-end.

96. On November 7, 2024, Elf filed its quarterly report for the second quarter of fiscal year 2025 ("Q2 2025 10-Q"). The Q2 2025 10-Q included SOX certifications, signed by Defendants Amin and Fields, and stated that the filing fairly presented the Company's financial condition, results of operations, and cash flows. It claimed Elf was well-positioned to compete in the beauty market, citing its value proposition, consumer engagement, and execution capabilities. The Q2 2025 10-Q also stated that there had been no changes to internal control over financial reporting during the quarter.

97. These representations were materially misleading. The Company was experiencing a growing inventory imbalance, deteriorating sell-through, and inadequate oversight mechanisms—yet these risks went undisclosed. Management's narrative presented a distorted view of the Company's actual financial health and failed to acknowledge the factors impairing performance.

98. Despite mounting internal concerns about excess inventory, slowing retail movement, and inflated growth projections, Elf's executives publicly maintained a message of continued strength and demand visibility. At the time, the Company was already suffering from weakening sales and rising unsold inventory. Rather than disclose these adverse conditions, Elf attributed inventory growth to benign supply chain factors and global demand planning. In reality,

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Elf had overstated revenue, profits, and inventory in prior quarters to maintain market optimism, and its public statements lacked a reasonable basis.

99. On November 20, 2024, Muddy Waters Research published a report titled *"e.l.f. Beauty, Inc.: A Revenue and Inventory Mystery"*, alleging that Elf had overstated revenue by approximately $135 million to $190 million over the preceding three quarters. The report accused Elf of inflating financial results following a slowdown in growth and inventory concerns that surfaced in the second quarter of fiscal year 2024.

100. According to Muddy Waters, Elf masked weakening demand by attributing an unexpected $36.9 million inventory spike to a new sourcing practice—claiming it had "just begun taking ownership of the product on the China side." The report cited a former China-based manager and three major suppliers who contradicted this claim, stating that Elf had long taken title to goods in China. Muddy Waters also pointed to a steep decline in imports from China, which had historically tracked closely with U.S. sales, concluding that Elf had already reduced planned purchases by the time of the second quarter earnings call on November 1, 2023, yet continued to raise its guidance in subsequent quarters.

101. Following release of the Muddy Waters report, Elf's stock declined $2.71 per share, or 2.23%, closing at $119.00 on November 20, 2024.

102. The next day, Elf publicly denied the allegations by Muddy Waters, stating in part: "We have rigorous inventory control procedures, including regular physical and cycle counts across our global distribution network. Similarly, we have rigorous controls and procedures around revenue recognition. We are fully confident in our financial statements."

103. This statement was materially false and misleading. In truth, Elf was experiencing significant sales declines and a mounting inventory overhang. Rather than disclose these operational problems, the Company misrepresented the buildup as the result of routine sourcing adjustments and continued to overstate its financial performance in order to sustain investor confidence.

***The Truth Fully Emerges***

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

104.    The truth fully emerged on February 6, 2025, when Elf issued a press release announcing financial results for the third quarter of the 2025 fiscal year. The Company disclosed it was revising its outlook downward for the upcoming fourth quarter, projecting net sales growth between negative 1% and positive 2%. It also reduced its full-year net sales guidance to a range of 27% to 28%, down from the prior range of 28% to 30%.

105.    Elf also lowered its adjusted EBITDA forecast to between $289 million and $293 million, compared to previous projections of $304 million to $308 million. During the earnings call, Defendant Fields attributed the shortfall to "softer than expected trends in January," citing a combination of "consumers stocking up in a highly promotional December," "lower social conversation around beauty," and slower-than-expected product launches.

106.    On this news, Elf's stock declined by $17.36 per share, or approximately 19.9%, closing at $71.13 on February 7, 2025. This steep drop marked a decisive break from the Company's prior narrative of uninterrupted growth and validated concerns that had surfaced months earlier.

## SECURITIES CLASS ACTION MOTION TO DISMISS

107.    On February 4, 2026, Judge Eumi K. Lee entered an order granting in part and denying in part the motion to dismiss the Securities Class Action. In doing so, Judge Lee stated that the Securities Class Action plaintiffs had "plausibly alleged a Section 10(b) claim again Amin and e.l.f. based on the November 2024 statements." Judge Lee also sustained the claim brought under Section 20(a) of the Exchange Act against Defendants Amin and Fields.

## DAMAGES TO ELF

108.    As a direct and proximate result of the Individual Defendants' misconduct, Elf has expended, and will continue to expend, significant sums of money.

109.    Such expenditures include, but are not limited to, legal fees associated with defending against the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, as well as payments of any fine or settlement amounts associated with the Company's violations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal controls with respect to financial reporting, public disclosures, and legal and regulatory compliance.

111. These losses also include, but are not limited to, substantial compensation, bonuses and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

112. As a direct and proximate result of the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties, Elf has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future.

**DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS**

113. Plaintiff brings this action derivatively in the right of and for the benefit of Elf to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

114. Elf is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

115. Plaintiff is an owner of Elf stock and has been a continuous shareholder of Company stock at all relevant times.

116. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

117. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

118. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

119. On June 13, 2025, Plaintiff, through Plaintiff's counsel, served the Demand on Elf's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by permitting Elf to issue the improper statements set forth herein. The Demand outlined the same alleged misstatements made during the Relevant Period that are detailed herein.

120. On July 14, 2025, Plaintiff's counsel received the Initial Letter indicating that the Board "intends to consider the Demand at its next regularly scheduled Board meeting."

121. On September 29, 2025, Plaintiff received the Demand Refusal Letter, which stated that the Board had met regarding the Demand and determined that, due to the pendency of the Securities Class Action and certain related shareholder derivative actions, "it would be in the best interest of the Company and its shareholders . . . to defer substantive consideration of the Demand until a later point in time."

122. At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Amin, Watson, Levitan, Keith, Mitchell, Daniele, Tait, and Ferreras (the "Director Defendants"). The Board also consisted of non-party director Chip Bergh.

123. The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

124. The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the company neglected to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

125.    The Demand Refusal Letter asserts that the Board's refusal of the demand is reasonable, citing, *inter alia*, the ongoing nature of the Securities Class Action as sufficient cause to refuse the demand. The Demand Refusal Letter does not, however, contain any evaluation of the merits of the Demand, nor does it communicate the Board's conclusions regarding the merits of the Demand.

126.    The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

127.    The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

128.    For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Elf.

## CLAIM I

### *Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act*

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that: "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of nay facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

131.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

132.    The Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

133.    Under the direction and watch of the Individual Defendants, the 2023, and 2024 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company was facing greater challenges in maintaining adequate inventory levels due to a decrease in sales; (2) Elf attributed these inventory levels to challenges in its sourcing practices; (3) Elf reported inflated revenue, profits, and inventory for several quarters; and (4) as a result, the Company's business and/or financial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134.    The misrepresentations and omissions in the Proxy Statements were material to Elf stockholders, specifically in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Director Defendants.

135.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions.

136.    Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM II

### *Against the Individual Defendants for Breach of Fiduciary Duties*

137.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138.    Each Individual Defendant owed to Elf the fiduciary duty to exercise candor, good faith, fair dealing, and loyalty in the management and administration of Elf's business and affairs, particularly with respect to issues as fundamental as public disclosures.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

139.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

140.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company and to protect the rights and interests of Elf's shareholders.

141.     The Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall business, operations, and prospects.

142.     The Individual Defendants had actual or constructive knowledge that they caused the Company to engage in fraudulent schemes set forth herein and to fail to maintain adequate internal controls.

143.      The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed for the purpose and effect of artificially inflating the price of Elf's securities. As such, the Individual Defendants' intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Elf.

144.     Four of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

145.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Elf has sustained and continues to sustain significant monetary damages as well as reputational harm and damage to the share price of the Company's stock. Such damages include costs of defending itsElf in the Securities Class Action and exposing the Company to millions of dollars in potential class-wide damages.

147.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have encouraged, facilitated, and advanced their breach of their fiduciary duties.

151.    In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

152.    Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM IV

### Against the Individual Defendants for Waste of Corporate Assets

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    By failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Elf to waste valuable corporate assets. Specifically, the Individual Defendants have caused Elf to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products. Moreover, the Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

155. The issuance of false and misleading statements by the Individual Defendants was continuous, connected, and ongoing through the Relevant Period and resulted in continuous, connected, and ongoing harm to Elf

156. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

157. Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM V

### Against the Individual Defendants for Unjust Enrichment

158. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Elf.

160. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Elf that was tied to the performance or artificially inflated valuation of Elf, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

161. Plaintiff, as a shareholder and a representative of Elf, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

162. Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM VI

### Against the Individual Defendants for Abuse of Control

163. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

35

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

164. The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

165. As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

166. Plaintiff, on behalf of Elf, has no adequate remedy at law.

## CLAIM VIII

### *Against Defendants Amin and Fields for Contribution Under 21D of the Exchange Act*

167. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168. Elf and Defendants Amin and Fields are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Amin and Fields's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

169. Defendants Amin and Fields, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

170. Accordingly, Defendants Amin and Fields are liable under and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

171. As such, Elf is entitled to receive all appropriate contribution or indemnification from Defendants Amin and Fields.

172. Plaintiff, on behalf of Elf, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Elf and that Plaintiff is a proper and adequate representative of the Company;

B.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Elf;

C.      Against all of the Defendants and in favor of Elf for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

D.      Directing Elf to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Elf and its shareholders from a continuation or repetition of the damaging events described herein;

E.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F.      Awarding Elf restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants, including profits obtained by insider sales;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 14, 2026                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         /s/Laurence M. Rosen
                                         Laurence M. Rosen, Esq. (SBN 219683)
                                         355 South Grand Avenue, Suite 2450

37

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Felipe Peerally am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 4/3/2026 .

Signed by:

Felipe Peerally

# Exhibit A



June 13, 2025

Phillip Kim
philkim@rosenlegal.com

**VIA FEDEX**
Tarang Amin
Chairman of the Board of Directors
e.l.f. Beauty, Inc.
570 10th Street
Oakland, California 94607

**Re:**    **Shareholder Litigation Demand on e.l.f. Beauty, Inc. Board of Directors**

Dear Mr. Amin,

We write on behalf of Filipe Peerally (the "Shareholder"), who owns shares of e.l.f. Beauty, Inc. ("Elf" or the "Company") and has continuously held those shares at all relevant times.

This letter constitutes a formal demand that the Board of Directors of Elf (the "Board") investigate and, if warranted, initiate legal proceedings against the following current and/or former officers and directors of the Company: Mandy Fields ("Fields"); Tiffany Daniele ("Daniele"); Maria Ferreras ("Ferreras"); Lori Keith ("Keith"); Lauren Cooks Levitan ("Levitan"); Kenny Mitchell ("Mitchell"); Beth Pritchard ("Pritchard"); Gayle Tait ("Tait"); Maureen Watson ("Watson"); Richard Wolford ("Wolford"); and you, Tarang Amin ("Amin") (collectively, the "Officers and Directors"), for potential breaches of fiduciary duty, corporate mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934, and related misconduct.

As fiduciaries, these individuals were obligated to act in good faith, exercise due care, and remain loyal to the Company and its shareholders. Their duties required them to remain informed about the Company's operations, actively oversee management, and ensure that disclosures to investors were accurate and complete. These obligations were reinforced by the Company's Code of Business Conduct and Ethics ("Code of Conduct") and the responsibilities outlined in its Audit Committee Charter.

As discussed in detail below, the Shareholder believes the Officers and Directors breached these duties, aided and abetted such breaches, and/or were unjustly enriched at the Company's expense. Accordingly, the Board must promptly and independently investigate these matters and take all necessary steps to recover damages and obtain appropriate relief. The Shareholder further

1

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

urges the Board to implement governance reforms to mitigate future risk, restore investor confidence, and ensure the integrity of internal oversight. Any conflicts of interest must also be fully addressed.

The Shareholder reserves all rights and may amend or supplement this demand as additional facts emerge.

## I.      FACTUAL BACKGROUND

As you are aware, Elf is a Delaware corporation headquartered in Oakland, California. Publicly traded since 2016 under the NYSE ticker symbol "ELF," the Company operates a multi-brand beauty business through subsidiaries including e.l.f. Cosmetics, e.l.f. Skin, Well People, Naturium, and Keys Soulcare. Elf positions itself as a mission-driven company offering clean, cruelty-free, vegan, and affordable beauty products. Its flagship e.l.f. Cosmetics line averages $6 per item, placing it on the lower end of the mass and prestige market.

Elf distributes its products through an omni-channel model that includes direct-to-consumer e-commerce, third-party online marketplaces, and major U.S. and international retailers such as Target, Walmart, and Ulta Beauty—which collectively generate a substantial portion of the Company's revenue. Elf promotes its supply chain as asset-light, efficient, and scalable, enabling rapid fulfillment and product launches across both digital and brick-and-mortar channels.

According to its public filings, Elf recognizes revenue upon the transfer of control to the customer, net of returns, markdowns, and other adjustments. Because inventory is procured in advance of demand, metrics such as shipment timing, sell-through rates, and inventory turnover are key indicators of whether reported revenue reflects actual consumer demand or simply movement of product into distribution channels. A mismatch between shipments and end-user demand can materially misrepresent financial results, obscure operational risks, and impair visibility into the Company's true financial condition. Overestimating demand results in excess inventory, markdowns, and write-downs; underestimating demand leads to missed sales and lost revenue. Accordingly, investors and analysts rely heavily on the Company's representations regarding inventory management, sourcing practices, and demand trends to evaluate the reliability and sustainability of its financial performance.

In the second quarter of the fiscal year ended March 31, 2024, Elf experienced a material inventory buildup driven by softening consumer demand. Rather than disclose this deterioration, management misled investors by attributing the increase to changes in logistics and preparations for continued growth. Internally, sales were slowing. Nonetheless, Elf continued to portray momentum, issued inflated revenue and profit figures, and falsely represented the adequacy of its internal controls and demand visibility. These misstatements created a distorted picture of the Company's operational health.

Following a series of disclosures—including lowered guidance, a report issued by Muddy Waters Research, and multiple significant stock price declines—investors learned that Elf may have overstated revenue by as much as $190 million, misrepresented inventory trends, and concealed weakening demand. The Company's stock declined nearly 47% between August 2024 and February 2025, representing a loss of more than $57 per share in value. During this period, Elf

2

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

repurchased over 100,000 shares at inflated prices, spending approximately $17.1 million—an overpayment of up to $9.3 million. At the same time, multiple insiders engaged in substantial stock sales, collectively generating more than $140 million in proceeds.

Despite these developments, the Board has taken no corrective action. It has not launched an internal investigation, implemented meaningful reforms, or held any individuals accountable. As a result, Elf has suffered significant damages, including loss of market capitalization, legal exposure, reputational harm, waste of corporate assets, and unjust enrichment of insiders.

Accordingly, demand is hereby made upon the Board to investigate promptly the misconduct described herein and take all appropriate steps to protect the interests of the Company. This includes, but is not limited to, initiating proceedings against those responsible for breaching their fiduciary duties, recovering improper gains, implementing governance reforms, and remedying the harm inflicted on the Company. Should the Board fail to act, the Shareholder is prepared to pursue all available remedies on the Company's behalf.

\*       \*       \*

## II.      THE FALSE AND MISLEADING STATMENTS

*May 24, 2023, Press Release and Earnings Call.* On May 24, 2023, Elf issued a press release announcing its financial results for the fourth quarter and full fiscal year of 2023. In the release, the Company stated, "Net sales increased 78% to $187.4 million, primarily driven by strength across our retailer and e-commerce channels." CEO Amin added, "We grew net sales by 78% in the fourth quarter, marking our seventeenth consecutive quarter of net sales growth."

During the earnings call, CFO Fields stated, "As CEO Amin discussed, this year we plan to invest behind our ERP transition to SAP, working capital to support the strong demand we continue to see, and increasing our distribution capacity." She added: "We ended the fiscal year with significant momentum and believe we have the right strategy in place to support our growth in the year ahead. In Q1, we expect our net sales growth to come in well ahead of our 22% to 24% annual growth, reflecting the ongoing strong consumption trends we are seeing."

*May 25, 2023, Form 10-K.* On May 25, 2023, Elf filed its annual report on Form 10-K for the fiscal year ended March 31, 2023. The filing was signed by CEO Amin, CFO Fields, and directors including Keith, Levitan, Mitchell, Daniele, Tait, Pritchard, Watson, and Wolford. It included Sarbanes-Oxley Act of 2002 ("SOX") certifications from Amin and Fields attesting that the report fairly presented the Company's financial condition and operating results. The report also stated that Elf's internal control over financial reporting was effective as of March 31, 2023.

These representations were materially misleading. By this time, internal data showed that wholesale shipments were outpacing actual retail sell-through. The Company lacked adequate internal controls to monitor key retail metrics such as inventory velocity and sell-through rates, yet publicly claimed those controls were functioning effectively. Management also portrayed demand trends as strong and sustainable while omitting adverse facts about mounting inventory levels and channel stuffing. As a result, investors were misled into believing that demand was

3

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

genuine and that Elf's financial oversight and controls were sound—when, in reality, both were deteriorating.

*July 12, 2023, 2023 Proxy Statement.* On July 12, 2023, Elf filed its 2023 Proxy Statement with the SEC on Schedule 14A, soliciting shareholder votes for the reelection of directors Mitchell, Tait, and Watson and the approval of executive compensation. The 2023 Proxy Statement, issued under the authority of CEO Amin and directors Daniele, Keith, Levitan, Mitchell, Pritchard, Tait, Watson, and Wolford, included numerous material misstatements and omissions. It described the Board as actively overseeing risk management and asserted that the Company adhered to its Code of Conduct. It further claimed that the Board fulfilled its fiduciary obligations and provided effective oversight of operational, financial, legal, risks.

In truth, the Company was experiencing growing inventory imbalances and weakening consumer demand—facts not disclosed to shareholders. Revenue, inventory, and profit figures were materially overstated, and officers and directors failed to adhere to the Company's Code of Conduct without disclosing or obtaining the required waivers. These misrepresentations induced shareholders to approve executive compensation packages and reelect directors under false pretenses, perpetuating the misconduct and compounding the harm to the Company.

*August 1, 2023, Press Release and Earnings Call.* On August 1, 2023, Elf announced its financial results for the first quarter of fiscal year 2024. The Company reported that net sales had increased 76% to $216.3 million, "primarily driven by strength in both our retailer and e-commerce channels." CEO Amin stated:

> This marks our eighteenth consecutive quarter of delivering both net sales growth and market share gains... As we look ahead, we believe we are in the early innings of unlocking the full potential we see for e.l.f. Beauty and are raising our fiscal 2024 outlook to reflect our continued momentum.

Later that day, during the earnings call, CFO Fields disclosed that the Company's inventory balance had risen to $98 million, up from $70 million the prior year. She assured investors that the increase was "in line with our expectations" and necessary to "support the strong consumer demand we're seeing." She emphasized: "Shipments exceeded consumption this quarter as we started to recover on some out of stock items," and reiterated management's plan to "build back our inventory levels through fiscal 2024" in anticipation of continued demand. Fields also cited ongoing investments in infrastructure, ERP systems, working capital, and distribution capacity, all positioned as necessary to sustain the Company's "significant top line outperformance." She further noted that inventory reserves had come in "lower this quarter," but acknowledged that such adjustments "ebb and flow from quarter to quarter," indicating volatility in inventory valuation and quality.

CEO Amin echoed these assurances, stating: "We're off to an incredibly strong start this fiscal year, delivering first quarter results well ahead of expectations," and emphasized that "e.l.f. grew net sales by 76%," marking its eighteenth consecutive quarter of growth. He described Elf as "one of only five public consumer companies out of 274 total that has grown for eighteen straight quarters."

4

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

*August 2, 2023, Form 10-Q.* Elf filed its quarterly report for the first quarter of fiscal year 2024 with the SEC on August 2, 2023 ("Q1 2024 10-Q"). The Q1 2024 10-Q, signed by CEO Amin and CFO Fields, included SOX certifications attesting that the report fairly presented, in all material respects, the financial condition and operating results of the Company. It also stated that Elf's internal controls were effective as of June 30, 2023, and that management, including Amin and Fields, had evaluated those controls and found no material weaknesses. The Q1 2024 10-Q also described inventory levels as aligned with demand, reinforcing the narrative that strong sell-through and demand visibility supported ongoing growth. In reality, Elf's internal controls over financial reporting and inventory management were already deteriorating. A growing misalignment between inventory levels and retail sell-through had begun to distort revenue recognition and obscure risks. These omissions rendered the Q1 2024 10-Q materially misleading.

*November 1, 2023 Press Release and Earnings Call.* On November 1, 2023, Elf issued a press release announcing its financial results for the second quarter of fiscal year 2024, reporting: "Net sales increased 76% to $215.5 million, primarily driven by strength in both retailer and e-commerce channels." CEO Amin was quoted as saying:

> We continue to deliver exceptional, consistent, category-leading sales growth. In Q2, we grew net sales by 76% and category share by 330 basis points, marking our 19th consecutive quarter of growth in each. As we look ahead, the significant whitespace we see across color cosmetics, skin care and international gives us confidence that we are in the early innings of unlocking the full potential we see for e.l.f. Beauty.

That same day, the Company held an earnings call to discuss the results. CEO Amin continued to emphasize the Company's strong performance:

> In the second quarter, we grew net sales by 76%, increased gross margin by 570 basis points and delivered $60 million in adjusted EBITDA, up 122% versus prior year.

> We're one of only five public consumer companies out of 274 that has grown for nineteen straight quarters and averaged at least 20% sales growth per quarter.

> Our supply chain offers the best combination of cost, quality and speed in our industry and has been able to keep pace with the strong consumer demand we're seeing.

CFO Fields also underscored management's confidence in the Company's planning and demand visibility: "Our ending inventory balance was $147 million, in line with our expectations and up from $81 million a year ago. … We plan to build back our inventory levels through fiscal 2024 to support the strong consumer demand we're seeing."

Fields explained that part of the increase was due to a shift in accounting treatment: "Approximately $37 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S."

5

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

She further assured investors that the growth in inventory was controlled and strategic and noted that "lower inventory adjustments" had supported margin performance during the quarter.

*November 2, 2023 Form 10-Q.* On November 2, 2023, Elf filed its quarterly report on Form 10-Q for the second quarter of fiscal year 2024 ("Q2 2024 10-Q"). The Q2 2024 10-Q, signed by CEO Amin and CFO Fields, included SOX certifications attesting that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company." Management described Elf as well-positioned in the competitive beauty market due to its value proposition, innovation, consumer engagement, and operational agility. The Q2 2024 10-Q emphasized strong relationships with major retail partners—including Target, Walmart, and Ulta Beauty—as drivers of continued domestic and international expansion.

The statements made by Elf in November 2023 were materially false and misleading. While the Company portrayed itself as executing a well-managed and disciplined growth strategy, Elf was already experiencing a significant disconnect between wholesale shipments and actual retail sell-through. Inventory levels at key retail partners were rising beyond consumer demand, creating hidden risks to future growth and profitability. Rather than disclose these developments, Elf misrepresented its demand visibility and falsely suggested that rising inventory was the result of deliberate planning. At the same time, management affirmatively stated in the Q2 2024 10-Q that there had been no changes to internal controls over financial reporting, despite known deficiencies that prevented accurate monitoring of retail-level inventory and sell-through velocity.

*February 6, 2024 Press Release and Earnings Call.* On February 6, 2024, Elf issued a press release announcing its financial results for the third quarter of fiscal year 2024. The release reported that net sales had increased 85% to $270.9 million, "primarily driven by strength in both retailer and e-commerce channels."

CEO Amin was quoted as stating:

Our vision is to create a different kind of beauty company and you can see that in the exceptional, consistent, category-leading growth we've delivered. In Q3, we grew net sales by 85% and market share by 305 basis points, marking our 20th consecutive quarter of growth in each. I'm extremely proud of our team and the progress we continue to make across color cosmetics, skin care and internationally.

During the subsequent earnings call, Amin reiterated these claims:

In Q3, we grew net sales by 85%, increased gross margin by nearly 350 basis points, and delivered $59 million in adjusted EBITDA, up 61% versus prior year… We've executed against our vision and delivered exceptional, consistent category leading growth. Q3 marked our 20th consecutive quarter of net sales growth, putting e.l.f. Beauty in a rarefied group of consistent, high growth consumer companies.

He continued: "We feel really good about the 53% growth that's implied in Q4, even though we're comping a quarter that's closer to 80%."

6

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

Amin touted the Company's financial outlook noting:

We believe we are well-positioned to deliver another industry leading year. Our raised outlook reflects the outperformance in Q3 we saw relative to our expectations as well as an improved outlook for the balance of the year. Our guidance implies approximately 48% to 53% net sales growth in Q4. Turning to gross margin. In fiscal '24, we expect our gross margin to be up approximately 280 basis points year-over-year, as compared to our expectations for up 225 basis points previously. The improved outlook is largely a result of our outperformance in Q3.

CFO Fields echoed this narrative, highlighting strong digital growth and forecasting continued expansion:

Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with approximately $72 million in cash on hand compared to a cash balance of $87 million a year ago. Our ending inventory balance was $205 million in-line with our expectations and up from $81 million a year ago.

Fields disclosed that the Company's inventory had risen to $205 million—up from $81 million a year earlier—and attributed the increase to three factors: planned rebuilding of inventory to support anticipated consumer demand; a shift in accounting treatment that recognized inventory from China at the time of shipment rather than receipt; and the addition of Naturium's inventory. She added: "We believe we have the appropriate levels of inventory across the business to service our customers and support the demand we're seeing."

*February 7, 2024 Form 10-Q.* On February 7, 2024, Elf filed its quarterly report for the third quarter of fiscal year 2024 ("Q3 2024 10-Q"). Signed by CEO Amin and CFO Fields, the Q3 2024 10-Q included SOX certifications attesting that the filing fairly presented the Company's financial condition and results. The Q3 2024 10-Q claimed Elf's value-driven, clean beauty offerings and execution capabilities positioned it well in the competitive market, citing strong retail partnerships with Target, Walmart, and Ulta as drivers of expanded distribution. It also stated there were no material changes to internal controls during the quarter.

The public statements made by Elf's senior management in February 2024 were materially misleading because they projected a narrative of uninterrupted growth, strong demand, and well-managed operations. In reality, internal risks were intensifying. Inventory levels were escalating significantly faster than actual sell-through at retail, and demand was beginning to soften. Despite these warning signs, management failed to disclose the risks associated with channel saturation, excess inventory, and the limitations of its internal controls. By reinforcing a narrative of sustained expansion and operational control, CEO Amin and CFO Fields materially misled investors about the Company's financial condition and future prospects.

*May 22, 2024 Press Release and Earnings Call.* On May 22, 2024, Elf issued a press release announcing its financial results for the fourth quarter and fiscal year ended March 31, 2024.

7

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

The Company reported that "net sales increased 71% to $321.1 million, primarily driven by strength across our retailer and e-commerce channels." CEO Amin stated:

> Fiscal 2024 marked our strongest year of net sales growth on record, a continuation of the exceptional, consistent, category-leading growth we've delivered. In [the] fourth quarter, we grew net sales by 71% and expanded our market share by 325 basis points, marking our 21st consecutive quarter of net sales and market share growth. As we look ahead, we believe we are still in the early innings of unlocking the full potential we see for e.l.f. Beauty across cosmetics, skin care and international markets.

During the Company's earnings call shortly thereafter, CEO Amin further emphasized the Company's growth trajectory: "In fiscal 2024, we grew net sales by 77%, increased gross margin by approximately 330 basis points, grew adjusted EBITDA by 101%, and increased market share by 305 basis points, well above our original expectations." He also claimed that: "We are one of only five public consumer companies out of 274 that has grown for 21 straight quarters and averaged at least 20% sales growth per quarter," and credited this performance to the Company's "value proposition, powerhouse innovation, and disruptive marketing engine."

Notably, Amin underscored Elf's bullish outlook on demand trends, stating, "We feel great about our inventory position… and certainly have room to support even further demand and upside potential should that come to fruition." He also remarked that the Company was "seeing a tremendous amount of pent-up demand for the brand" in international markets and that "consumers internationally are waiting for e.l.f. when we enter the market."

CFO Fields echoed these optimistic themes in her prepared remarks: "Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans." She reported that the Company ended the quarter with $108 million in cash and an inventory balance of $191 million—up sharply from $81 million a year prior. Fields again attributed the huge increase in inventory to three factors: (1) a deliberate inventory build "to support strong consumer demand"; (2) the addition of Naturium, which added $26 million to inventory; and (3) a shift in how the Company accounts for China-based inventory ownership.

*May 23, 2024 Annual Report on Form 10-K.* On May 23, 2024, Elf filed its Annual Report on Form 10-K for the fiscal year ended March 31, 2024 ("2024 10-K"). The 2024 10-K was signed by CEO Amin, CFO Fields, and the Company's directors, and included SOX certifications from Amin and Fields attesting to the accuracy of the financial disclosures. The 2024 10-K portrayed Elf's market position as strong and differentiated, citing its accessible, clean beauty products and execution capabilities. It further claimed that internal controls over financial reporting were effective as of March 31, 2024.

The statements Elf made in May 2024 were materially misleading because they presented a narrative of accelerating growth, strong consumer demand, and disciplined inventory management, while omitting adverse internal data. In truth, the Company was already experiencing softening demand, retail channel saturation, and a growing disconnect between wholesale shipments and actual retail sell-through. Rather than acknowledge these issues, Elf attributed the

8

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

inventory buildup to benign factors such as strategic planning and logistics realignment—thereby concealing the extent to which reported revenue overstated true consumer pull-through. At the same time, the Company continued to affirm the strength of its internal controls and financial condition, materially misrepresenting the true state of its operations.

*July 12, 2024 Proxy Statement.* On July 12, 2024, Elf filed its 2024 Proxy Statement with the SEC, that sought shareholder approval on director reelections, executive compensation, and officer exculpation. CEO Amin and Directors Daniele, Keith, Levitan, Mitchell, Pritchard, Tait, Watson, and Wolford were responsible for the filing of the 2024 Proxy Statement, which misrepresented the Board's oversight and internal controls.

The 2024 Proxy Statement falsely claimed that the Board was managing risk effectively, that directors complied with the Code of Conduct, and that financial disclosures were accurate. In reality, the Company faced unresolved inventory issues and softening demand, which were concealed from shareholders. The Board failed to address these risks or prevent misleading disclosures, leading shareholders to approve proposals under false pretenses.

\*    \*    \*

*The Truth Begins to Emerge as False and Misleading Statements Continue*

*August 8, 2024 Press Release and Earnings Call.* The truth began to emerge on August 8, 2024, when Elf issued a press release announcing financial results for the first quarter of fiscal year 2025. Although the Company reported ostensibly strong headline figures—including net sales of $324.5 million, a 50% year-over-year increase—it also issued adjusted EBITDA guidance that came in approximately $30 million below analyst expectations.

Despite this disappointing outlook, senior management continued to issue statements that concealed mounting risks related to inventory buildup, internal control deficiencies, and deteriorating demand visibility. In the press release, CEO Amin stated:

> We are off to a strong start this fiscal year, delivering 50% net sales growth and 260 basis points of market share gains… This marked our 22nd consecutive quarter of both net sales growth and market share gains—putting e.l.f. Beauty in a rarified group of high growth consumer companies. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond.

During the earnings call held later that day, CEO Amin reiterated these points while ignoring key signs of operational weakness:

> In Q1 we grew net sales 50%, increased gross margin by approximately 80 basis points, and delivered $77 million in adjusted EBITDA… We are one of only five public consumer companies out of 274 that has grown for 22 straight quarters and averaged at least 20% sales growth per quarter.

9

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

During the Q&A session, in response to a question about whether the Company was seeing any signs of a consumer slowdown, Amin stated:

On your second question on consumer, any consumer slowdown or sentiment overall, I would say we are seeing some commentary of consumers being more choosy, but they're choosing e.l.f. I would say that we're particularly well positioned. … so we remain quite bullish in our ability to continue to drive market share both in color as well as skin care and our continued expansion internationally.

CFO Fields echoed this optimism and attempted to reassure investors about Elf's inventory position, stating: "Our ending inventory balance was $200 million, in line with expectations and up from $98 million a year ago." She once again attributed the massive inventory increase to three factors: rebuilding inventory to support "strong consumer demand," the inclusion of $26 million from newly acquired Naturium, and a $23 million shift in inventory accounting due to earlier transfer of ownership from China. She concluded: "We feel great about our inventory position… we've proactively taken our inventory levels up to support the demand that we're seeing… We are pleased with what we're seeing out of our retailers digitally, internationally... and continue to think we have momentum there."

*August 9, 2024 Form 10-Q.* The following day, Elf filed its quarterly report on Form 10-Q for the first quarter of 2025 ended June 30, 2024 ("Q1 2025 10-Q").  Signed by CEO Amin and CFO Fields, the filing included SOX certifications attesting that the report fairly presented the Company's financial condition. Consistent with prior filings, it promoted Elf's mission-driven branding and emphasized strong retail relationships with Target, Walmart, and Ulta Beauty. The Q1 2025 10-Q also affirmed: "We have assessed the impact on changes to our internal controls… and concluded that there have been no changes… that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

However, these statements stood in sharp contrast to material risks that were already unfolding inside the Company. By this time, the Company was already grappling with significant internal risks, including excess inventory, deficient internal controls, and a widening disconnect between wholesale shipments and retail sell-through. None of these adverse developments were disclosed. Instead, management continued to present a façade of operational momentum and financial strength.

Analysts expressed concern over the unexpected cut to guidance. UBS Research described the reduction as a "meaningful move" that implied channel underperformance and called the deceleration in top-line growth "perplexing," noting that "many of the key building blocks" of Elf's growth narrative appeared unchanged.

On this news, Elf's stock fell $27.12 per share, or 14.4%, closing at $160.83 on August 9, 2024—its steepest single-day decline in over a year.

*November 6, 2024 Press Release and Earnings Call.* On November 6, 2024, Elf issued a press release announcing financial results for the second quarter of the 2025 fiscal year. The release reported that "Net sales increased 40% to $301.1 million, primarily driven by strength in both our

10

retailer and e-commerce channels, in the U.S. and internationally." CEO Amin added, "This was our 23rd consecutive quarter of both net sales growth and market share gains. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond."

During the subsequent earnings call, Amin stated: "In the second quarter, we grew net sales by 40%, delivered $69 million in adjusted EBITDA, and became one of only six public consumer companies out of 546 that has grown for twenty-three straight quarters and averaged at least 20% sales growth per quarter."

CFO Fields echoed this positive narrative: "Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans."

She reported that Elf ended the quarter with $97 million in cash and $239 million in inventory, up from $147 million the prior year. She attributed the increase to timing of inventory ownership, the Naturium acquisition, and projected demand. In response to questions about the Company's growing inventory levels, Fields stated: "We feel great about our inventory position and feel that we have the inventory that we need to continue to support the demand that we're seeing."  Significantly, CFO Fields denied any risk of obsolescence, asserting that the inventory buildup supported the Company's global expansion and would normalize by year-end.

*November 7, 2024 Form 10-Q.* On November 7, 2024, Elf filed its quarterly report for the second quarter of fiscal year 2025 ("Q2 2025 10-Q"). Signed by CEO Amin and CFO Fields, the Q2 2025 10-Q included SOX certifications and stated that the filing fairly presented the Company's financial condition, results of operations, and cash flows. It claimed Elf was well-positioned to compete in the beauty market, citing its value proposition, consumer engagement, and execution capabilities. The Q2 2025 10-Q also stated that there had been no changes to internal control over financial reporting during the quarter.

These representations were materially misleading. The Company was experiencing a growing inventory imbalance, deteriorating sell-through, and inadequate oversight mechanisms—yet these risks went undisclosed. Management's narrative presented a distorted view of the Company's actual financial health and failed to acknowledge the factors impairing performance.

Despite mounting internal concerns about excess inventory, slowing retail movement, and inflated growth projections, Elf's executives publicly maintained a message of continued strength and demand visibility. At the time, the Company was already suffering from weakening sales and rising unsold inventory. Rather than disclose these adverse conditions, Elf attributed inventory growth to benign supply chain factors and global demand planning. In reality, Elf had overstated revenue, profits, and inventory in prior quarters to maintain market optimism, and its public statements lacked a reasonable basis.

*November 20, 2024 Muddy Waters Report and Company Response.* On November 20, 2024, Muddy Waters Research published a report titled *"e.l.f. Beauty, Inc.: A Revenue and Inventory Mystery"*, alleging that Elf had overstated revenue by approximately $135 million to $190 million over the preceding three quarters. The report accused Elf of inflating financial results

11

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

following a slowdown in growth and inventory concerns that surfaced in the second quarter of fiscal year 2024.

According to Muddy Waters, Elf masked weakening demand by attributing an unexpected $36.9 million inventory spike to a new sourcing practice—claiming it had "just begun taking ownership of the product on the China side." The report cited a former China-based manager and three major suppliers who contradicted this claim, stating that Elf had long taken title to goods in China. Muddy Waters also pointed to a steep decline in imports from China, which had historically tracked closely with U.S. sales, concluding that Elf had already reduced planned purchases by the time of the second quarter earnings call on November 1, 2023, yet continued to raise its guidance in subsequent quarters.

Following release of the Muddy Waters report, Elf's stock declined $2.71 per share, or 2.23%, closing at $119.00 on November 20, 2024.

The next day, Elf publicly denied these allegations stating in part: "We have rigorous inventory control procedures, including regular physical and cycle counts across our global distribution network. Similarly, we have rigorous controls and procedures around revenue recognition. We are fully confident in our financial statements."

This statement was materially false and misleading. In truth, Elf was experiencing significant sales declines and a mounting inventory overhang. Rather than disclose these operational problems, the Company misrepresented the buildup as the result of routine sourcing adjustments and continued to overstate its financial performance in order to sustain investor confidence.

\* \* \*

*The Truth Fully Emerges*

*February 6, 2025 Press Release.* The truth fully emerged on February 6, 2025, when Elf issued a press release announcing financial results for the third quarter of the 2025 fiscal year. The Company disclosed it was revising its outlook downward for the upcoming fourth quarter, projecting net sales growth between negative 1% and positive 2%. It also reduced its full-year net sales guidance to a range of 27% to 28%, down from the prior range of 28% to 30%.

Elf also lowered its adjusted EBITDA forecast to between $289 million and $293 million, compared to previous projections of $304 million to $308 million. During the earnings call, CFO Fields attributed the shortfall to "softer than expected trends in January," citing a combination of "consumers stocking up in a highly promotional December," "lower social conversation around beauty," and slower-than-expected product launches.

On this news, Elf's stock declined by $17.36 per share, or approximately 19.9%, closing at $71.13 on February 7, 2025. This steep drop marked a decisive break from the Company's prior narrative of uninterrupted growth and validated concerns that had surfaced months earlier.

12

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

\*　　\*　　\*

*Insider Trading*. Compounding the harm to the Company, several officers and directors engaged in suspicious and potentially unlawful sales of Elf stock while the market was misled by materially false and misleading statements. These transactions reflect serious failures of oversight and fiduciary responsibility. The following individuals executed trades at artificially inflated prices and realized substantial personal gains:

*CEO and Chairman of the Board Amin*. From June 2023 through December 2024, Amin sold 740,742 shares of Elf stock while in possession of material nonpublic information, generating approximately $107.4 million in total proceeds. These trades included, among others, a $12.3 million sale on April 18, 2024, and a $9.2 million sale on June 5, 2024—both occurring after the Company had begun experiencing inventory and demand issues but before these issues were disclosed to the market. As the most senior executive with access to internal financial and operational data, the timing and volume of Amin's trades raise serious concerns and warrant immediate scrutiny.

*CFO Fields*. Between June 2023 and June 2024, Fields sold 134,836 shares for approximately $19.7 million in total proceeds. Notable transactions include $4.8 million in sales on April 18, 2024, and $3.7 million just one day later. As CFO, Fields had direct access to the Company's true financial condition and inventory risks, making her trades particularly suspect.

*Director Levitan*. A member of the Board since 2016 and Chair of the Audit Committee, Levitan sold 24,418 shares between May 2023 and November 2024, generating approximately $3.5 million in proceeds. These trades included a $1.2 million sale on June 3, 2024—after internal visibility into operational challenges had already emerged.

*Director Watson*. Serving as Chair of the Nominating and Corporate Governance Committee, Watson sold 15,679 shares for approximately $2.5 million in total proceeds. These included a $1.3 million sale on February 23, 2024, amid continued public reassurances about business strength.

*Director Tait*. On February 29, 2024, Tait sold 835 shares at $206.00 per share, generating $172,010 in proceeds. Tait serves on the Compensation Committee and had ongoing access to internal strategic and performance data.

*Director Wolford*. Before his departure from the Board in August 2024, Wolford sold 47,845 shares, generating approximately $6 million. This included a $3.9 million sale on June 6, 2023, and a $2 million sale on June 7, 2024—just two months before material inventory and guidance issues began reaching the market.

*Director Pritchard*. Former Chair of the Nominating and Corporate Governance Committee, Pritchard sold 8,306 shares on September 7, 2023, at $133.20 per share, generating approximately $1.1 million in proceeds.

13

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

*Director Daniele.* A member of the Audit Committee, Daniele sold 1,253 shares on August 31, 2023, at $139.09 per share, earning $174,279.

These trades—both in timing and volume—raise serious concerns and suggest a pattern of insider trading. Each transaction was executed during a period when Elf's public disclosures materially misrepresented demand, inventory levels, and financial performance. This conduct requires immediate investigation by the Board and potential action for breaches of fiduciary duty, including disgorgement of illicit gains.

\* \* \*

*Company Stock Repurchases at Inflated Prices.* In August 2024, Elf's officers and directors authorized the repurchase of 108,753 shares of Company stock at an average price of $157.04 per share, for a total expenditure of approximately $17.1 million. These repurchases occurred while the Company was actively concealing deteriorating demand and rising inventory risks. Following corrective disclosures in February 2025, Elf's stock dropped to $71.13 per share. Based on this post-disclosure price, the Company overpaid by at least $4.1 million—and potentially more than $9.3 million, according to internal estimates. These repurchases were executed at inflated prices, reinforced a misleading narrative of corporate health, and resulted in a waste of corporate assets. This conduct constitutes a serious breach of fiduciary duty.

\* \* \*

*Damages Sustained by the Company.* As a direct and foreseeable consequence of misconduct by certain officers and directors, Elf has suffered—and continues to suffer—significant harm. The Company has incurred, and will continue to incur, substantial legal and professional expenses defending litigation, including federal securities class actions and related derivative actions, as well as fees for outside counsel, accountants, and investigators. These costs have already diverted corporate resources to address allegations of misleading financial disclosures, internal control failures, and insider trading. At the same time, senior executives and directors received substantial compensation in the form of salaries, bonuses, stock grants, and other benefits—despite presiding over a period of ineffective internal controls and misstated financial results. These awards represent an unjust transfer of corporate assets to individuals whose conduct exposed the Company to material risk.

Additionally, in August 2024, Elf repurchased 108,753 shares of its common stock at artificially inflated prices, spending approximately $17.1 million and overpaying by at least $4.1 million—potentially as much as $9.3 million—based on the stock's post-disclosure value. These buybacks depleted corporate funds and falsely signaled market confidence. During the same period, multiple officers and directors sold tens of millions of dollars in Elf stock while in possession of material nonpublic information. These insider trades, compounded by misleading public statements and wasteful repurchases, raise serious concerns of insider enrichment and demand accountability. The Company has also sustained lasting reputational damage. Following a series of corrective disclosures between August 2024 and February 2025, Elf's stock price declined nearly 47%, eliminating more than $57 per share in value. This loss of investor confidence, along with diminished market credibility and strategic partnerships, will likely impair

14

Shareholder Demand on Elf, Inc.'s Board of Directors
June 13, 2025

the Company's long-term prospects. Taken together, these failures have materially harmed Elf's financial condition, operations, and reputation. The Board must act swiftly to recover improper compensation, pursue claims against responsible parties, strengthen internal governance, and investigate potential insider trading before further damage is done.

### III.    DEMAND

In light of the facts and allegations set forth above, the Shareholder demands that the Board promptly and thoroughly investigate whether any current or former officers and directors of Elf engaged in breaches of fiduciary duty, gross mismanagement, or other violations of law or Company policy. This investigation must be conducted independently, without the influence of any individuals who may be implicated in the underlying misconduct.

The Shareholder further demands that the Board initiate a civil action against all individuals found to be responsible—including, at a minimum, the Officers and Directors—to recover, for the benefit of the Company, the full amount of damages sustained as a result of their misconduct. The Board must also evaluate whether third parties such as auditors, legal advisors, or financial consultants should be held accountable and added as defendants where appropriate.

In addition, the Company must immediately adopt meaningful corporate governance reforms to prevent future violations and restore investor confidence. These measures are essential to ensure that Elf is managed in a manner consistent with its legal obligations and long-term business interests.

Please confirm receipt of this letter and advise what steps the Board intends to take to address the serious harm inflicted upon Elf. If the Board fails to initiate the demanded actions within a reasonable time, our client is prepared to initiate litigation to protect the Company's interests. We are prepared to assist the Board in conducting its investigation, and to review and provide input on any findings, reports, or proposed remedial actions.

Should you have any questions, please contact the undersigned counsel. We look forward to your prompt response.

Very truly yours,

*Phillip Kim*

Phillip Kim

Cc: Erica Stone (estone@rosenlegal.com)
    Luke Foley (lfoley@rosenlegal.com)

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10116 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

# Exhibit B

**Colleen Smith**
Direct Dial: 1.858.523.3985
colleen.smith@lw.com

12670 High Bluff Drive
San Diego, California 92130
Tel: +1.858.523.5400  Fax: +1.858.523.5450
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

<u>**VIA EMAIL**</u>

July 14, 2025

Phillip Kim
The Rosen Law Firm
275 Madison Avenue
40th Floor
New York, NY 10016
philkim@rosenlegal.com

Re:     <u>**Shareholder Litigation Demand on e.l.f. Beauty, Inc. Board of Directors**</u>

Dear Counsel:

We write on behalf of e.l.f. Beauty, Inc. ("e.l.f.") and its Board of Directors ("Board") in connection with your letter dated June 13, 2025 on behalf of purported stockholder Filipe Peerally, demanding that the Board investigate and initiate litigation against certain e.l.f. officers and directors (the "Demand").

The Board intends to consider the Demand at its next regularly scheduled Board meeting and we will respond promptly after the Board has considered the Demand and determined what course of action, if any, it should take.  In the meantime, e.l.f. and the Board reserve all rights and objections to the Demand and reserve all other defenses with regard to the matters raised in the Demand.

Best regards,

Colleen Smith
of LATHAM & WATKINS LLP

# Exhibit C

Daniel R. Gherardi
+1.650.470.4941
daniel.gherardi@lw.com

140 Scott Drive
Menlo Park, California  94025
Tel: +1.650.328.4600  Fax: +1.650.463.2600
www.lw.com

## LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

February 19, 2026

**VIA EMAIL**

Phillip Kim
Luke Foley
The Rosen Law Firm
275 Madison Avenue, 40th Floor
New York, NY 10116
philkim@rosenlegal.com
lfoley@rosenlegal.com

Re:     *Shareholder Litigation Demand on e.l.f. Beauty, Inc. Board of Directors*

Counsel:

We write on behalf of the Board of Directors ("Board") of e.l.f. Beauty, Inc. ("e.l.f." or the "Company"), in response to your letter dated February 16, 2026 on behalf of purported e.l.f. stockholder Filipe Peerally.  Your letter claims that "Mr. Peerally has not received [] a response to his Demand from the Board" following our July 14, 2025 letter acknowledging receipt of the Demand.  That is incorrect.  We sent you the Board's response to Mr. Peerally's Demand via email (to philkim@rosenlegal.com and lfoley@rosenlegal.com) on September 29, 2025 at 6:14 p.m. Pacific Time.  For your convenience, we attach that correspondence again to this letter.

The Board continues to monitor the parallel litigation referenced in our September 29, 2025 letter, including in connection with Mr. Peerally's Demand.  Please do not hesitate to contact me at the email address or telephone number above if you would like to discuss.

Best regards,

Daniel R. Gherardi
of LATHAM & WATKINS LLP

Daniel R. Gherardi
+1.650.470.4941
daniel.gherardi@lw.com

140 Scott Drive
Menlo Park, California  94025
Tel: +1.650.328.4600  Fax: +1.650.463.2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

September 29, 2025

**VIA EMAIL**

Phillip Kim
Luke Foley
The Rosen Law Firm
275 Madison Avenue, 40th Floor
New York, NY 10116
philkim@rosenlegal.com
lfoley@rosenlegal.com

Re:     *Shareholder Litigation Demand on e.l.f. Beauty, Inc. Board of Directors*

Counsel,

We write on behalf of the Board of Directors ("Board") of e.l.f. Beauty, Inc. ("e.l.f." or the "Company"), in response to your letter dated June 13, 2025 on behalf of purported e.l.f. stockholder Filipe Peerally.  Your client demands, among other things, that the Board cause the Company to investigate and then initiate legal action against certain of the e.l.f.'s current and former officers and directors (the "Demand").

As we expect you are aware, the Demand follows multiple lawsuits involving substantially the same allegations in the Demand, including a securities class action, *In re e.l.f. Beauty, Inc. Securities Litigation*, Case No. 5:25-cv-02316-EKL (N.D. Cal.) (the "Securities Class Action"), a consolidated derivative action *In re e.l.f. Beauty, Inc. Stockholder Derivative Litigation*, Case No. 5:25-cv-02905-EKL (N.D. Cal.) (the "Consolidated Derivative Action"), and a shareholder derivative action *Venikov v. Amin, et al.*, Case No. 1:25-cv-00623-CFC (D. Del.) (with the Consolidated Derivative Action the "Related Derivative Actions").

On August 21, 2025, the Board met to consider the Demand.  Given the virtual complete overlap between the Demand's allegations and those in the Securities Class Action and the Related Derivative Actions, the Board determined that it would be in the best interest of the Company and its shareholders to monitor the Securities Class Action and Related Derivative Actions and to defer substantive consideration of the Demand until a later point in time, including potentially following final resolution of the Securities Class Action and Related Derivative Actions.  This is consistent with a substantial body of case law, in which courts routinely recognize it is reasonable for a board to defer investigation of claims made in a shareholder derivative demand that overlap with parallel securities litigation pending resolution of the securities litigation.  *See e.g., Furman v. Walton*, 320 F. App'x 638, 640 (9th Cir. 2009) (applying Delaware law and affirming that there were rational business purposes for deferring because "bringing suit as per [the] demand might have constituted a harmful admission in litigation pending against [the company]"); *Gamoran v. Neuberger Berman, LLC*, 2012 WL 2148217, at *5 (S.D.N.Y. June 12, 2012) (interpreting Delaware's demand requirement and finding that it is reasonable to defer response to a demand to focus on

LATHAM&WATKINS LLP

pending related litigation). This same reasoning accords with courts' routine practice of staying derivative litigation in favor of overlapping securities litigation. *See, e.g., In re Rh Shareholder Derivative Litig.*, 2019 WL 580668, at *5 (N.D. Cal. Jan. 23, 2019) (collecting cases and staying derivative action in favor of parallel securities action to avoid defendants having to potentially take conflicting legal positions); *Janklow v. Alutto,* 2018 WL 6499869, at *2 (D. Del. Dec. 11, 2018) ("Defendants are likely to suffer prejudice if the present [derivative] litigation is not stayed because Defendants may be forced to take inconsistent positions if required to litigate simultaneously the Securities Class Action and the present action."); *In re Insys Therapeutics Inc. Deriv. Litig.,* 2017 WL 5953515, at *2-3 (Del. Ch. Nov. 30, 2017) (similar); *In re Duke Energy Corp. Coal Ash Deriv. Litig.*, 2015 WL 5135066, at *1 (Del. Ch. Aug. 31, 2015) (similar); *In re STEC, Inc. Derivative Litig.*, 2012 WL 8978155 (C.D. Cal. Jan. 11, 2012) (collecting cases and noting that "[c]ourts generally stay a shareholder derivative suit until the culmination of a securities class action when the cases arise from the same factual allegations and the evidence in the former could jeopardize the company's defense in the latter."). Indeed, courts regularly recognize the "practical difficulty of pursuing potentially divergent strategies if the two actions are litigated simultaneously." *In re First Solar Derivative Litig.*, 2012 WL 6570914, at *2 (D. Ariz. Dec. 17, 2012).

The Board's determination to defer a decision on the Demand not only prevents this prejudice, it also will promote judicial efficiency and avoid unnecessary waste of resources. *See, e.g., In re Geron Corp. S'holder Deriv. Litig.*, 2022 WL 1836238, at *2 (Del. Ch. Jun. 3, 2022) (staying a subsequently filed derivative matter pending further outcome in a securities class action asserting nearly identical claims because "a stay will have the added advantage of avoiding potentially inconsistent rulings"); *Brenner v. Albrecht*, 2012 WL 252286, at *6 (Del. Ch. Jan. 27, 2012) (finding that pursuing two simultaneous actions on behalf of a company is "unduly complicated, inefficient, and unnecessary."); *Insys*, 2017 WL 5953515, at *3 (same).

For similar reasons, courts also recognize that it is reasonable for a board to defer consideration of a demand in the unique situation where the question of its independence to consider such a demand is pending in related derivative actions, as is the case here. *See Witmer on Behalf of Banc of California, Inc. v. Sugarman*, 2018 WL 4846917, at *5 (C.D. Cal. Aug. 23, 2018) (dismissing demand refusal action as premature where board stated it would defer consideration of demand until after pending demand futility litigation was resolved); *Maccoumber v. Austin*, 2004 WL 1745751, at *6 (N.D. Ill. Aug. 2, 2004) ("given that the resolution of the demand futility issue in the [pending derivative action] could resolve this action, it would be unreasonable to require the Board to expend [the Company's] resources unnecessarily."); *Piven v. Ryan*, 2006 WL 756043, at *4 (N.D. Ill. Mar. 23, 2006) (same).

In light of the foregoing, the Board believes it would be in the best interests of e.l.f. and its shareholders to defer substantive consideration of the Demand at this time. The Board's deferral of the Demand is just that—it is not a rejection of the Demand. The Board will continue to evaluate the issues raised in the Demand in due course. In the meantime, the Company reserves all rights and objections with respect to the Demand, and all other defenses, whether legal, equitable, or otherwise. The Board will keep you apprised of any further determination or decision regarding the Demand.

LATHAM&WATKINS LLP

      Please do not hesitate to contact me at the email address or telephone number above if you would like to discuss.

Best regards,

Daniel R. Gherardi
of LATHAM & WATKINS LLP